Cordell D. MEEKS et al., Plaintiffs,

v.

William H. AVERY et al., Defendants.

No. KC–2421.

United States District Court
D. Kansas.

Feb. 17, 1966.

John E. Shamberg, Kansas City, Kan., Joseph J. Poizner, Kansas City, Kan., Thomas M. Van Cleave, Jr., Kansas City, Kan., Conrad Miller, Kansas City, Kan., for plaintiff.

Robert C. Londerholm, Atty. Gen. State of Kansas, Topeka, Kan., for defendant.

Before HILL, Circuit Judge, and STANLEY and TEMPLAR, District Judges.

ARTHUR J. STANLEY, Jr., District Judge:

The plaintiffs attack the statute dividing the State of Kansas into five congressional districts and establishing the boundaries of those districts. Chapter 13, Session Laws of Kansas, 1965 (referred to in the complaint as House Bill 764).[1]

The statute was enacted by the 1965 regular session of the Legislature of Kansas, and by its terms will apply to the primary and general elections of 1966.

An attempt by the 1961 legislature to realign the state's congressional districts (K.S.A. 4–114 to 4–119) was aborted by court action. Meeks v. Anderson, 229 F.Supp. 271 (D.Kan.1964).[2]

The districts created by the 1961 statute varied in population from a low of 373,583 to a high of 539,592, with a devia-

---

1. *"Be it enacted by the Legislature of the State of Kansas:*

"Section 1. The state of Kansas is hereby divided into five (5) districts for the election of representatives to the congress of the United States, each of which districts shall be entitled to elect one (1) representative. The limits and designations of the counties of each district shall be as provided in sections 2 to 6, both inclusive, of this act.

"Sec. 2. The counties of Cheyenne, Sherman, Wallace, Greeley, Hamilton, Stanton, Morton, Stevens, Grant, Kearny, Wichita, Logan, Thomas, Rawlins, Decatur, Sheridan, Gove, Scott, Lane, Finney, Haskell, Seward, Meade, Gray, Clark, Ford, Hodgeman, Ness, Trego, Graham, Norton, Phillips, Rooks, Ellis, Rush, Pawnee, Edwards, Kowa, Pratt, Stafford, Barton, Russell, Osborne, Smith, Jewell, Mitchell, Lincoln, Ellsworth, Saline, Ottawa, Cloud, and Republic shall constitute the first district.

"Sec. 3. The counties of Washington, Clay, Dickinson, Morris, Geary, Riley, Marshall, Pottawatomie, Wabaunsee, Shawnee, Jackson, Nemaha, Brown, Doniphan, Atchison, Jefferson, and Leavenworth, the cities of Edwardsville and Bonner Springs in Wyandotte county and the townships of Delaware, Prairie, and Quindaro in Wyandotte county shall constitute the second district.

"Sec. 4. The counties of Douglas, Franklin, Anderson, Miami, and Johnson, the townships of Shawnee and Wyandotte in Wyandotte county, and the city of Kansas City, Kansas, shall constitute the third district.

"Sec. 5. The counties of Rice, Reno, Kingman, McPherson, Harvey, and Marion, and all of Sedgwick county except the cities of Cheney, Viola, Clearwater, Haysville, Derby, Mulvane, Garden Plain and Goddard and the townships of Morton, Erie, Afton, Viola, Illinois, Ninnescah, Waco, Ohio, Salem, Rockford, Attica, ·

Garden Plain, Grand River and precincts 1 and 2 in Riverside township, shall constitute the fourth district.

"Sec. 6. The counties of Comanche, Barber, Harper, Sumner, Cowley, Butler, Chase, Lyon, Greenwood, Elk, Chautauqua, Montgomery, Wilson, Woodson, Coffey, Osage, Labette, Neosho, Allen, Linn, Bourbon, Crawford, and Cherokee and the cities of Cheney, Viola, Clearwater, Haysville, Derby, Mulvane, Garden Plain and Goddard in Sedgwick county and the townships of Morton, Erie, Afton, Viola, Illinois, Ninnescah, Waco, Ohio, Salem, Rockford, Attica, Garden Plain, Grand River and precincts 1 and 2 in Riverside township in Sedgwick county shall constitute the fifth district.

"Sec. 7. Whenever a county, township, city or precinct is included in any congressional district under the provisions of sections 1 to 6, both inclusive, of this act it shall mean to include such territory as was within such county, township, city or precinct as the same was constituted on March 1, 1965.

"Sec. 8. The provisions of this act shall not affect the term of any representative to congress elected to represent a district at the general election of 1964, nor to any successor elected to succeed such representative for an unexpired term, and all such congressmen shall continue to serve the districts from which elected until the representatives elected from the congressional districts established by this act shall commence their terms of office in January, 1967.

"Sec. 9. Existing K.S.A. 4–114 to 4–119, both inclusive, are hereby repealed.

"Sec. 10. This act shall take effect and be in force from and after its publication in the official state paper."

2. In that case the effective date of the decree was stayed so as to permit the 1964 elections to be held and those elected to serve.

tion from equal apportionment of at least 38%. The court concluded that the statute did not conform to federal constitutional requirements and declared it null and void.

In this case, the parties have stipulated the facts and by pretrial order have agreed that the issues are those set out in subparagraphs 1, 2, 3, 4, 5 and 6 of Paragraph V of plaintiffs' complaint:

"1. House Bill 764 does not provide for congressional districts as nearly equal as is practicable, based solely on population, so as to provide that the vote of one man in a congressional election is worth as much as is another's, in violation of Article I, Section 2 of the Constitution of the United States and Section 1 of the XIVth Amendment to the Constitution of the United States. Although other plans were presented to the Kansas Legislature, which, if adopted, would have more nearly approached the goal of giving approximate equal weight to each vote, these plans were ignored by the Legislature. By the enactment of House Bill 764 the Kansas Legislature wholly failed to provide for equal representation for equal numbers of people and thereby deprived vast numbers of Kansas citizens of their precious right of the franchise, a fundamental constitutional right preservative of all individual rights.

"2. The enforcement of House Bill 764 disenfranchises large numbers of citizens, inhabitants of the State of Kansas, and thus violates Article I, Section 2 of the Constitution of the United States and the XIVth Amendment to the Constitution of the United States, which guarantees all citizens equal protection of the laws, because the influence and effect of citizens in one congressional district as presently composed is substantially less than the influences and effect of citizens in other of the congressional districts as presently composed.

"3. The enforcement of House Bill 764 dilutes and debases one person's vote and on the other hand magnifies and enhances disapportionately another person's vote, in violation, derogation and complete disregard of the cherished constitutional rights of each individual inhabitant of the State of Kansas, the net effect and result of which is to deprive the individuals thus discriminated against of their vote and to create unnecessary inequalities in the relative strength and effectiveness of the several congressional districts, in violation of the XIVth Amendment to the Constitution of the United States.

"4. House Bill 764 is invalid and unconstitutional for the reason that the Kansas Legislature failed and refused to determine the population of the State of Kansas for the purpose of fixing the size of congressional districts by employing the 1960 Federal Decennial Census population figures and failed and refused to employ the enumerating standards prescribed in the 1960 Federal Decennial Census in determining the population of Kansas, all in violation of the provisions of Section 2 of the XIVth Amendment to the Constitution of the United States and Article I, Sections 2 and 4 of the Constitution of the United States and the provisions of the act of June 18, 1929, 46 U.S.Statutes 26. [2 U.S.C.A. § 2a]

"5. House Bill 764 is unconstitutional in that it places parts of two counties, to-wit: Wyandotte County and Sedgwick County, each in two separate congressional districts, although neither county in itself contains sufficient population to create even one congressional district. Said House Bill 764 thus destroys the integrity of two basic political subdivisions of the state and creates chaos and havoc in the organization for effective political action of the

two major political parties in the two separated parts of these counties and in the cities, townships, boards and precincts contained within the boundaries of said counties so divided, with the overall effect and result that the voters in the counties so split are deprived of effective voting power, in violation of the equal protection clause of the XIVth Amendment to the Constitution of the United States. In some instances precincts lying within the boundaries of the two counties are themselves split by the splitting of the counties and the citizens living in said precincts do not know and are unable to determine in which congressional district they are to vote, as a result their vote is rendered nugatory. The splitting of Wyandotte County and Sedgwick County as aforesaid is totally devoid of any plan or objective to achieve equality of population in the congressional districts of which these counties are parts and is an unconscionable destruction of a basic governmental unit in each case which will result in the creating of political, social and individual problems of such catastrophic consequences that the counties thus split will be unable to function as effective subdivisions of the state government.

"6. The plan of re-districting the congressional districts of Kansas as provided for in House Bill 764 was not intended to and, in fact, does not provide for compact and contiguous congressional districts best suited and drawn to serve the needs and requirements of the constituents of said respective districts but on the other hand embodies a plan to so draw district lines as to minimize and cancel out the voting strength of substantial segments of the population of the State of Kansas and to dilute, cancel out, minimize and destroy the voting strength of substantial political elements within the state. Said House Bill 764 thus results in invidious discrimination of said persons so affected and violates the XIVth Amendment to the Constitution of the United States and Article I, Section 2 thereof."

A map showing the district boundaries and population figures appears as Appendix A.

The question that must first be answered is posed by the fourth issue (Paragraph V4 of the complaint). The plaintiffs maintain that the legislature was required by the provisions of Section 2 of the Fourteenth Amendment to the Constitution and Article I, Sections 2 and 4 of the Constitution, and by 2 U.S.C.A. § 2a to employ the population figures developed by the 1960 federal census rather than those shown by the 1964 enumeration of inhabitants required by state law.[3]

3. "11–101. Collection of statistical data by deputy assessors. Each deputy assessor, at the time for taking lists of property for taxation in each year, shall annually ascertain in a full and complete manner and accurately and legibly set down in schedules prepared for that purpose such data relating to agriculture in his assessing district as may be required by the state board of agriculture, and shall make an annual enumeration of inhabitants in his assessing district, and properly record the same in suitable schedules, according to township, city or ward."

"11–102. Blanks for deputy assessors; abstract of statistics. The assessor of each county shall furnish the deputy assessors of his county such blank schedules as may be necessary for properly recording the enumeration of inhabitants and agricultural data, as required in the foregoing section of this act, which said blank schedules, together with blank forms for the abstracts hereinafter provided, shall be furnished by the state board of agriculture to the county assessors; and each county assessor shall make an abstract, in duplicate, of the aforesaid enumeration and data, compiled by townships, cities and wards, and shall forward, on or before July 15 of each year, the original abstract, properly certified as to its accuracy, together with the original schedules of deputy assessors' returns, to the state board of agriculture. The second copy of the abstract shall be retained in the archives of the county assessor's office, and all schedules furnished to the

Although administered by the state Board of Agriculture and referred to in argument as an agricultural census, the enumeration made in Kansas each year, at least since 1899,[4] is an actual head count of the inhabitants of the state and of its political subdivisions. The figures reflected by the state enumeration are accepted as establishing the official population of municipalities. State ex rel. McBride v. Commissioners of Phillips County, 26 Kan. 419 (1881). And as determining the applicability of state statutes based on the population of counties and cities. State ex rel. Clark v. Board of Education, 148 Kan. 632, 84 P.2d 507 (1938). County officials have been ousted from office for tampering with the enumeration figures. State ex rel. v. Duncan, 134 Kan. 85, 4 P.2d 443 (1931). During the argument counsel for the plaintiffs stated that its accuracy was not questioned.

While the legislative history of Chapter 13 is meager, we do have a memorandum of the Research Department of the Kansas Legislative Council dated May 27, 1965 (after the enactment of the statute), which was introduced by stipulation as Exhibit 6 and to which is attached an opinion of the Attorney General of Kansas dated February 9, 1965. The attorney general's opinion presumably was requested by the legislature or by one or more of its committees. At any rate, it was available to the legislature, and that body was entitled to take it into consideration in arriving at its decision as to which population figures should be utilized. A copy of the memorandum and opinion appears as Appendix B.

The ideal district population figure (total state population divided by 5) varies only slightly, being 436,107 according to the state enumeration, and 435,722 according to the federal census. The use of the state's 1964 figures results in a maximum variation from the norm of only 8,490, while the maximum variation from the norm, using the federal figures, is 41,666. This is because, while there is little difference in the total population between the two, there are appreciable variances in the indicated populations of the separate districts. This may be the result of shifts of population within the state in the period 1960 to 1964 or to a difference in the criteria employed by the enumerating agencies. We incline toward the latter explanation. The population of Leavenworth County, according to the 1960 federal census, was 48,524. The state enumeration for the same year shows a population of 37,388, a difference of 11,186. Fort Leavenworth, with the Army's Command and General Staff College, is located in Leavenworth County, as are four penal institutions, two state and two federal, and a college. The federal enumerators, in accordance with the policies of the United States Census Bureau, would have counted all military personnel, all prisoners, and all college students as inhabitants of Leavenworth County. The state's assessors would have counted only those who had established residence in the county (Exhibit 6).

An analysis of the population figures of the five districts, based on each concept, appears as Appendix C.

■ References in Article I, Sections 2 and 4; in Section 2 of the Fourteenth

---

county assessor by the state board of agriculture shall be accounted for by the county assessor and by him returned to the state board of agriculture each year, at the time the abstract has been made up and forwarded as required."

• *"11–106. How information obtained.* Each deputy assessor shall perform the services required of him by a personal visit to each dwelling house, and to each family in his assessment district, and shall ascertain by inquiries made of some member of each family, if anyone can be found capable of giving the information, but if not, then of the agents of such family, and if the agents cannot be found, then he shall obtain the information from the most reliable source. The information so recorded shall be read to the person or persons furnishing the facts, to correct errors and supply omissions, if any exist."

4. For a history of legislation see Sickly v. Board of Com'rs of Allen County, 83 Kan. 740, 112 P. 621 (1911).

Amendment to the Constitution; and in 2 U.S.C.A. § 2a, to the enumeration of the population of the various states have to do with the apportionment of representatives *among* the states, not within them.

■ The Kansas Legislature, in setting out to create congressional districts which would result in an apportionment based substantially on population, first of all with the task of deciding which of two available sets of figures, equally accurate, should be employed. One set, the state's was closer in point of time. Because of different criteria employed, one set, the state's, more nearly reflected an enumeration of those entitled to vote in congressional elections. One set, the state's, excluded individuals who were unlikely to be interested in the political, social and economic problems of the state. The record is completely devoid of any indication that the choice of the 1964 state enumeration figures over the 1960 federal census figures as the basis for determination of population was anything more than the exercise of judgment in the legislative process. We find no constitutional fault with the choice made.

■ The plaintiffs complain (Paragraph V5) that Wyandotte and Sedgwick Counties are segmented by placing part of Wyandotte in the second district and part in the third, while part of Sedgwick County is placed in the fourth district and part in the fifth. The population of neither county exceeds the ideal population of a district. Kansas' largest city, Wichita, is located in Sedgwick County, and the second city, Kansas City, lies in Wyandotte County.

The sixth ground of attack (Paragraph V6) is that the districts are not compact and contiguous. The two contentions, while separately phrased, amount to a single charge of gerrymandering for partisan political advantage.

It is no longer required by statute that congressional districts be compact and contiguous. Congress by the Act of August 8, 1911 (37 Stat. 14) required that

representatives to Congress "be elected by districts composed of contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants." This provision was embodied in 2 U.S.C.A. § 3 and applied to the election of representatives "under this apportionment" (that of 1911). It was not restated in the Reapportionment Acts of 1929 or 1941 (2 U.S.C.A. Ch. 1), and expired by its own limitation. See Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131.

We find that the plaintiffs have not sustained the burden of showing that the challenged statute was the product of contrived gerrymandering for partisan political purposes. See Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed. 2d 512. Moreover, we reject this attack as a matter of law.

It is not claimed that the boundaries of the districts were drawn for any reason having to do with the racial makeup of the area enclosed in each district as in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. This case bears no resemblance to Wright v. Rockefeller, supra, in which the Supreme Court intimated that lines drawn for the purpose of separating racial groups would be violative of the Fourteenth Amendment.

■ The Supreme Court in WMCA, Inc. v. Lomenzo, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2, 3, affirmed summarily the judgment of the three-judge court reported in D.C., 238 F.Supp. 916. In a concurring opinion Mr. Justice Harlan said: "In WMCA, Inc. v. Lomenzo, D.C., 238 F.Supp. 916, the three-judge court found that Plan A satisfied this order [a court order requiring enactment of a valid apportionment scheme]; in so doing it rejected contentions that apportioning on a basis of *citizen* population violates the Federal Constitution, and that partisan 'gerrymandering' may be subject to federal constitutional attack under the Fourteenth Amendment. In affirming this decision, this Court necessarily affirms these two eminently correct principles." It is now clear that par-

tisan political gerrymandering is not condemned as violative of the Fourteenth Amendment. WMCA, Inc. v. Lomenzo, supra; Bush v. Martin, 251 F.Supp. 484 (S.D.Tex. January 5, 1966).

■ We do not overlook the principal enunciated by this court in Long v. Avery, 251 F.Supp. 541, decided December 28, 1965, as modified February 11, 1966) in which we held that where in a reapportionment statute a pattern is disclosed in which the integrity of political subdivision is ignored, then the districts could be formed with population substantially equal in each of them; and when county lines were so completely disregarded in so many instances, the court felt justified in holding that a pattern had developed in which the integrity of political subdivision was ignored and that under the apportionment in that case, the disparity of population between the largest district and the smallest one far exceeded what would be permissible in any event. Here, only the two most populous counties in the state were divided. This is not sufficient to establish a pattern of ignoring political subdivisions. Furthermore, the degree of variance that exists in population of the congressional districts in this case is within permissible limits.

By the allegations of the first three subparagraphs of Paragraph V of their complaint, the plaintiffs challenge Chapter 13 as not meeting the standards set up by the Supreme Court in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L. Ed.2d 481.[5] In *Wesberry*, and in the many cases spawned by *Wesberry*, the rules laid down appear to be:

"(A)s nearly as is practicable one man's vote in a congressional election

is to be worth as much as another's." 376 U.S. at 7–8, 84 S.Ct. at 530. "(L)egislatures may [not] draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." 376 U.S. at 14, 84 S.Ct. at 533. "Members of Congress are to be elected on the basis of population and nothing else."[6] Bush v. Martin, 224 F.Supp. 499 at 511 (S.D.Tex.1963).

■ The Constitution requires "that a State make an honest and good faith effort to construct [congressional] districts * * * as nearly of equal population as is practicable." Reynolds v. Sims, 377 U.S. 533 at 577, 84 S.Ct. 1362 at 1390, 12 L.Ed.2d 506 at 536.

Since we hold that the Kansas Legislature was justified in its reliance on the population figures shown by the state's 1964 enumeration, we must now examine the challenged statute in the light of those figures. Keeping in mind that the ideal population of a district is 436,107, we find the population of each of the districts created by Chapter 13 to be: First district, 441,873; second district, 436,085; third district, 427,617; fourth district, 442,677; fifth district, 432,281.[7]

Thus we find that the greatest disparity between districts is that between the third and fourth—15,060; the greatest variation from the ideal population for a district is in the third district which has 8,490 less than the average; the ratio of the most populous district, the fourth, to the least populous, the third, is 1.03521 to 1.

5. For a thorough analysis of *Wesberry* and its progeny, see the opinion of Judge Brown in Bush v. Martin, 251 F.Supp. 484, S.D.Tex. January 5, 1966.

6. The three-judge court in *Bush* recognized that there might be a disparity between population and qualified voters (see footnote 29, 224 F.Supp. at 511). And see Reynolds v. Sims, 377 U.S. at 577, 84 S.Ct. at 1390, where the Supreme Court speaks of the arrangement of

legislative districts so that "each one has an identical number of *residents, or citizens, or voters*." (Emphasis supplied). We assume as did the court in Bush v. Martin, supra, that the population statistics reflected by the state enumerator fairly represent the electorate.

7. Variation from the ideal and percentages over and under the ideal are shown in Appendix C.

While in Reynolds v. Sims, supra, the Supreme Court was dealing with state legislative apportionment, the court's use of the term "substantial equality of population" is the equivalent of the phrase "as nearly as practicable" used in *Wesberry*, a case involving congressional districting. See Bush v. Martin, (S.D.Tex. 1966), supra. The statement in *Reynolds*, 377 U.S. at 577, 84 S.Ct. at 1390, that: " * * * it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters [and that] (m)athematical exactness or precision is hardly a workable constitutional requirement" is equally applicable to congressional districting and legislative apportionment.

It is true that some of the plans considered by the legislature came closer to numerical equality than did the plan adopted by the enactment of Chapter 13. Our duty, however, is not to pick and choose among the schemes suggested, but to determine whether Chapter 13 conforms to the requirements of the Constitution. As was said by Judge Brown in Bush v. Martin, (S.D.Tex.1966), supra, " * * * the goal is not mathematical precision. What is required is not merely that numerical equality be achieved as nearly as practicable. Rather, it is that in this legislative function, the *Legislature* achieved numerical equality as nearly as is practicable. That means that until such time as the State Legislature indicates its complete unwillingness or inability to face up to the job, the apportionment, state and congressional, is for the Legislature, not the Courts. If— and the if is neither real nor big—it is a legislative function until default, then a proper regard for the separation of powers and the wide discretion necessarily reposed in each branch, must take into account that the Legislature is to employ its traditional methods and proc-

esses. This means that for the Legislature to be effective, it must enact legislation. The enactment of legislation is left to a legislative body which exists under the broad commands of the republican form of government Guaranty Clause of Art. 4, § 4, of the Constitution. See Baker v. Carr, 1962, 369 U.S. 186, 218–219, 82 S.Ct. 691, 711, 7 L.Ed.2d 663, 687. Its duty is, of course, to act under the law. And the product may finally be rejected by a reviewing court. But no court can command that legislators agree, or that a majority of them must agree, or that they must agree within specified limits.

"Of course certain minimum standards may be laid down against which the resulting legislative product will be tested. To this extent legislative freedom or discretion is, of course, confined or constricted. But if it is to be legislative action, and courts are to supplant legislative action only after a demonstrated default, then courts must be careful in specifying standards lest what is legislative in name turns out to be in fact merely a court-contrived plan under a more palatable mantle of legislation."

█ We find and hold that the Legislature of Kansas, by the enactment of the challenged statute, made a good faith effort to meet the constitutional standards as set out in Wesberry v. Sanders, supra; that while mathematical perfection was not achieved, that goal was approached as nearly as the legislators in their good judgment believed to be practicable; that the legislature in enacting Chapter 13 did not exceed the permissible bounds of discretion in deviating from apportionment strictly according to population; that a population variance ratio between the most populous and least populous districts of 1.03521 meets minimal constitutional requirements.

A decree will be entered in accordance with this opinion.

APPENDIX A

POPULATIONS * AND BOUNDARIES OF KANSAS CONGRESSIONAL
DISTRICTS AS ENACTED IN HOUSE BILL 764, 1965 SESSION

December 21, 1965

*Figures underscored are from the 1964 State Board of Agriculture Census; total state population — 2,180,533. Figures in parentheses are from the 1960 Federal Census; total state population — 2,178,611.

APPENDIX B

MEMORANDUM

May 27, 1965

Research Department, Kansas
Legislative Council

RE: Enumeration Standards of the U.
S. Bureau of the Census and Kan-
sas State Board of Agriculture

The policy adopted by the U. S. Census
Bureau for the 1960 decennial census
provided for counting a person as an
inhabitant of his usual place of resi-
dence, and "usual place" was further de-
fined to mean the place where the person
sleeps or lives most of the time. The
application of this policy to specific situ-
ations is indicated in the following state-
ments of the Bureau.

## USUAL PLACE OF RESIDENCE

"In accordance with census prac-
tice dating back to 1790, each per-
son enumerated in the 1960 Census
was counted as an inhabitant of his
usual place of abode, which is gen-
erally construed to mean the place
where he lives and sleeps most of
the time. This place is not neces-
sarily the same as his legal residence,
voting residence, or domicile; how-
ever, in the vast majority of cases,
the use of these different bases of
classification would produce sub-
stantially the same statistics, al-
though there may be appreciable
differences for a few areas.

In the application of this rule,
persons were not always counted as
residents of the places in which
they happened to be found by the
census enumerators. Persons in the
larger hotels, motels, and similar
places were enumerated on the night
of March 31, and those whose usual
place of residence was elsewhere
were allocated to their homes. In
addition, information on persons
away from their usual place of resi-
dence was obtained from other mem-
bers of their families, landladies, etc.
If an entire family was expected to
be away during the whole period of
the enumeration, information on it
was obtained from neighbors. A
matching process was used to elimi-
nate duplicate reports for a person
who reported for himself while
away from his usual residence and
who was also reported at his usual
residence by someone else.

Persons in the Armed Forces
quartered on military installations
were enumerated as residents of the
States, counties, and minor civil di-
visions in which their installations
were located. Members of their
families were enumerated where
they actually resided. As in 1950,
college students were considered
residents of the communities in
which they were residing while at-
tending college. The crews of ves-
sels of the U. S. Navy and of the U. S.
Merchant Marine in harbors of the
United States were counted as part
of the population of the ports in
which their vessels were berthed on
April 1, 1960. Inmates of institu-
tions, who ordinarily live there for
long periods of time, were counted
as inhabitants of the place in which
the institution was located, whereas
patients in general hospitals, who
ordinarily remain for short periods
of time, were counted at, or allocated
to, their homes. Persons without
a usual place of residence were
counted where they were enumerat-
ed.

Persons staying overnight at a
mission, flophouse, jail, detention
center, reception and diagnostic
center, or other similar place on a
specified night (for example, April
8 in some areas) were enumerated
on that night as residents of that
place.

Americans who were overseas for
an extended period (in the Armed
Forces, working at civilian jobs,
studying in foreign universities,
etc.) are not included in the popula-
tion of any of the States or the Dis-

trict of Columbia. On the other hand, persons temporarily abroad on vacations, business trips, and the like, were enumerated at their usual residences on the basis of information received from members of their families or from neighbors."*

The Kansas provisions for an annual census are established by K.S.A. 11–101 to 11–114. K.S.A. 11–101 provides as follows:

"Each deputy assessor, at the time of taking lists of property for taxation in each year, shall ascertain in a full and complete manner and accurately and legibly set down in schedules prepared for that purpose such data relating to agriculture in his assessing district as may be required by the state board of agriculture, and shall make an annual enumeration of *inhabitants* of his assessing district, and properly record the same in suitable schedules, according to township, city or ward." (Emphasis added)**

The only formal definition of "inhabitant" is the following provision printed in the Deputy Assessor's Manual *Population Schedule for 1960* (Prepared by the Kansas State Board of Agriculture):

"*Who are inhabitants.* All persons who have established a permanent bode in Kansas, including hired hands and others who reside in the home or are temporarily absent therefrom.

*Children.* The place of legal residence of a child during his minority is, generally speaking, that of his father, even though the father changes his place of residence and the child actually lives apart from him, or is in the military service. If the father is dead, the child's residence is that of his mother. If both parents are dead, the child would be a resident of the city or township where he resides.

*Students.* Unmarried students at colleges, universities, and hospitals are temporarily [sic] away from home and should be listed as inhabitants of the city or township where they resided before going to school. Married students may establish a residence while attending school, if such is their intention.***

*Military personnel.* Military personnel are presumed to have the residence they had at the time of their enlistment or draft into military service. Persons in the service not living on a military base may establish a residence if such is their intention, as evidenced by registration to vote, etc. Persons living on a military post are not residents of Kansas. Persons under 21 years of age in the military service, continue to have the residence of their parents.

*Persons in institutions.* Persons in federal, state, county or municipal eleemosynary institutions, such as the Topeka State Hospital, Boys' Industrial School, School for the Deaf, etc., should be listed in the township or city in which they resided before going to the institution.

*Homes for the aged, rest homes, nursing homes.* Persons in homes maintained by private organizations, such as lodges, and in rest homes and nursing homes, may be assumed to have established a residence at the home.

* SOURCE: U. S. Bureau of the Census, United States Census of Population 1960, pp. vii-viii.

** K.S.A. 11–101 was amended by House Bill 1085 in the 1965 Session of the Kansas Legislature. However, the provision calling for "enumeration of *inhabitants*" was not affected by this legislation.

*** In 1963 the section on *Students* was changed to read as follows: "*Students.* Unmarried students who are away from home attending school or taking hospital training, should be listed as inhabitants of the city or township where they resided before going away to school."

*Penal institutions.* Persons in penitentiaries or reform schools should not be listed as they are not citizens.

List the name, address and age of each inhabitant residing in Kansas, including the head of the family, hired help and all members of the family at home, those temporarily absent in military service, students, inmates of eleemosynary institutions, and other actual residents. Do not include visitors or transients temporarily present.

Write distinctly as these schedules are filed with the State Historical Society and become a permanent record to prove age and residence of inhabitants at any time in the future.****

In 1960, there were no specific instructions regarding civilians living on federal property; the counting of military personnel was specifically provided for under the heading noted above. According to the Department of Agriculture, civilians living on federal property were not to be counted, since the people are not considered residents; and it was assumed that local assessors so acted. However, in 1960 it was brought to the attention of the Department that in at least one instance civilians living on federal property were included in the State Census. As a result, specific instructions regarding this subject were included in the 1961 manual and each subsequent one since. The 1961 instructions were worded as follows:

"*Federal Property.* Persons living in areas over which the State of Kansas has surrendered jurisdiction to the United States should not be counted as they are not inhabitants. These areas are designated in Chapter 27 of the General Statutes of Kansas, and include Fort Riley Military Reservation, the National Soldier's Home at Leavenworth, etc."

Assuming the definitions were applied consistently, the U. S. Bureau of the Census and the State Board of Agriculture Census reported a potentially significant different 1960 total population for a political subdivision in such situations as the following:

1. Where a military reservation was located, the State did not count those persons living on the reservation. Military personnel living off the base were counted by the State, it being assumed they established residence. The U. S. Census counted both groups and listed the location of the base as the place of residence.

2. Where a penal institution was located, the State did not count the inmates (State Reformatory, State Penitentiary). Inmates of local jails were not counted. The U. S. Census counted inmates as residents of the political subdivision where the institution was located.

3. Where a State eleemosynary institution was located, the patients were counted by the State as inhabitants of the political subdivision where they resided before entering the institution. In contrast, the U. S. Bureau of the Census considered the location of the institution as the place of residence.

4. Where a state or private educational institution was located, the unmarried students were counted as residents of the place where they resided before enrolling in the school. The U. S. Bureau of the Census considered the students as residents of the place where the institution was located.

The following table shows the population for 1960 for each county as reported by the two agencies.

**** SOURCE: Kansas State Board of Agricultural, *Kansas Population Schedule for 1960.*

The figures enclosed in parentheses (in Column 3) are the numerical amount of population reported by the Kansas State Census which is over and above that reported by the U. S. Census. It should also be noted that the figures in parentheses do not represent military personnel only. They also include persons in certain institutions and schools and colleges who are assigned to their home county by the State Census.

The figures *not* enclosed in parentheses (in Column 3) are the numerical amount of population reported by the U. S. Census which is over and above that reported by the Kansas State Census.

## TABLE I – POPULATION OF KANSAS, 1960

| COUNTY | 1960 STATE BOARD OF AGRICULTURE | 1960 FEDERAL BUREAU OF CENSUS | FROM STATE CENSUS DIFFERENCE |
|---|---|---|---|
| Allen | 17,005 | 16,369 | (636) |
| Anderson | 9,648 | 9,035 | (613) |
| Atchison | 20,416 | 20,898 | 482 |
| Barber | 8,754 | 8,713 | (41) |
| Barton | 34,147 | 32,368 | (1,779) |
| Bourbon | 16,405 | 16,090 | (315) |
| Brown | 14,536 | 13,229 | (1,307) |
| Butler | 38,120 | 38,395 | 275 |
| Chase | 3,978 | 3,921 | (57) |
| Chautauqua | 6,054 | 5,956 | (98) |
| Cherokee | 22,714 | 22,279 | (435) |
| Cheyenne | 4,753 | 4,708 | (45) |
| Clark | 3,491 | 3,396 | (95) |
| Clay | 10,810 | 10,675 | (135) |
| Cloud | 14,876 | 14,407 | (469) |
| Coffey | 8,635 | 8,403 | (232) |
| Comanche | 3,288 | 3,271 | (17) |
| Cowley | 37,114 | 37,861 | 747 |
| Crawford | 39,074 | 37,032 | (2,042) |
| Decatur | 6,121 | 5,778 | (343) |
| Dickinson | 22,523 | 21,572 | (951) |
| Doniphan | 10,344 | 9,574 | (770) |
| Douglas | 35,414 | 43,720 | 8,306 |
| Edwards | 5,511 | 5,118 | (393) |
| Elk | 5,363 | 5,048 | (315) |
| Ellis | 20,862 | 21,270 | 408 |
| Ellsworth | 8,220 | 7,677 | (543) |
| Finney | 15,726 | 16,093 | 367 |
| Ford | 20,100 | 20,938 | 838 |
| Franklin | 20,412 | 19,548 | (864) |
| Geary | 22,886 | 28,779 | 5,893 |
| Gove | 4,304 | 4,107 | (197) |
| Graham | 5,674 | 5,586 | (88) |
| Grant | 5,220 | 5,269 | 49 |
| Gray | 4,408 | 4,380 | (28) |
| Greeley | 2,178 | 2,087 | (91) |
| Greenwood | 11,571 | 11,253 | (318) |
| Hamilton | 3,187 | 3,144 | (43) |

| COUNTY | 1960 FEDERAL BOARD OF AGRICULTURE | 1960 FEDERAL BUREAU OF CENSUS | FROM STATE CENSUS DIFFERENCE |
|---|---|---|---|
| Harper | 9,879 | 9,541 | (338) |
| Harvey | 25,775 | 25,865 | 90 |
| Haskell | 3,012 | 2,990 | (22) |
| Hodgeman | 3,116 | 3,115 | (1) |
| Jackson | 10,381 | 10,309 | (72) |
| Jefferson | 11,261 | 11,252 | (9) |
| Jewell | 7,719 | 7,217 | (502) |
| Johnson | 138,998 | 143,792 | 4,794 |
| Kearny | 3,064 | 3,108 | 44 |
| Kingman | 10,480 | 9,958 | (522) |
| Kiowa | 4,613 | 4,626 | 13 |
| Labette | 26,353 | 26,805 | 452 |
| Lane | 3,148 | 3,060 | (88) |
| Leavenworth | 37,338 | 48,524 | 11,186 |
| Lincoln | 6,030 | 5,556 | (474) |
| Linn | 8,590 | 8,274 | (316) |
| Logan | 4,158 | 4,036 | (122) |
| Lyon | 24,584 | 26,928 | 2,344 |
| Marion | 15,535 | 15,143 | (392) |
| Marshall | 16,562 | 15,598 | (964) |
| McPherson | 23,886 | 24,285 | 399 |
| Meade | 5,559 | 5,505 | (54) |
| Miami | 18,981 | 19,884 | 903 |
| Mitchell | 8,973 | 8,866 | (107) |
| Montgomery | 46,508 | 45,007 | (1,501) |
| Morris | 7,676 | 7,392 | (284) |
| Morton | 3,317 | 3,354 | 37 |
| Nemaha | 13,431 | 12,897 | (534) |
| Neosho | 19,812 | 19,455 | (357) |
| Ness | 5,696 | 5,470 | (226) |
| Norton | 8,271 | 8,035 | (236) |
| Osage | 13,176 | 12,886 | (290) |
| Osborne | 7,663 | 7,506 | (157) |
| Ottawa | 7,006 | 6,779 | (227) |
| Pawnee | 9,342 | 10,254 | 912 |
| Phillips | 9,088 | 8,709 | (379) |
| Pottawatomie | 12,125 | 11,957 | (168) |
| Pratt | 12,079 | 12,122 | 43 |
| Rawlins | 5,381 | 5,279 | (102) |
| Reno | 59,116 | 59,055 | (61) |
| Republic | 10,083 | 9,768 | (315) |
| Rice | 14,041 | 13,909 | (132) |
| Riley | 29,985 | 41,914 | 11,929 |
| Rooks | 9,840 | 9,734 | (106) |
| Rush | 6,363 | 6,160 | (203) |
| Russell | 11,850 | 11,348 | (502) |
| Saline | 46,459 | 54,715 | 8,256 |
| Scott | 5,242 | 5,228 | (14) |
| Sedgwick | 325,399 | 343,231 | 17,832 |
| Seward | 16,023 | 15,930 | (93) |

| COUNTY | 1960 STATE BOARD OF AGRICULTURE | 1960 STATE BUREAU OF CENSUS | FROM STATE CENSUS DIFFERENCE |
|---|---|---|---|
| Shawnee | 134,440 | 141,286 | 6,846 |
| Sheridan | 4,395 | 4,267 | (128) |
| Sherman | 6,725 | 6,682 | (43) |
| Smith | 7,963 | 7,776 | (187) |
| Stafford | 7,812 | 7,451 | (361) |
| Stanton | 2,141 | 2,108 | (33) |
| Stevens | 4,320 | 4,400 | 80 |
| Sumner | 26,134 | 25,316 | (818) |
| Thomas | 7,513 | 7,358 | (155) |
| Trego | 5,571 | 5,473 | (98) |
| Wabaunsee | 6,741 | 6,648 | (93) |
| Wallace | 2,214 | 2,069 | (145) |
| Washington | 11,345 | 10,739 | (606) |
| Wichita | 2,820 | 2,765 | (55) |
| Wilson | 14,065 | 13,077 | (988) |
| Woodson | 5,584 | 5,423 | (161) |
| Wyandotte | 193,987 | 185,495 | (8,492) |
| TOTAL | 2,130,579 | 2,178,611 | 48,032 |

## Court Cases

The use of the Kansas State Census in state reapportionment matters was apparently first recognized formally by Kansas decisional law in State ex rel. Smith v. Board of Com'rs of Montgomery County, 125 Kan. 379, 264 P. 84 (1928) in which the court stated:

"* * * In making [census] returns to the state board of agriculture, the county clerk is required to make proper footings of the verified census returns, and to certify to the accuracy of his copy and footings. The verified and certified enumeration so made is official, and is to be used in the application of the statute requiring the redistricting of counties, the fixing of salaries of county officers and other provisions where the operation of statute is governed by the population of counties or other municipalities."

The most recent case in which the State Census was used was Harris v. Shanahan, 192 Kan. 183, 387 P.2d 771 (1963) in which the court said:

"The census used for this purpose (reapportionment) is the official state census which is made on an annual basis."

So far as is known, though, there is no specific case on use of the State Census for congressional reapportionment.

## Attorney General's Opinion

During the 1965 Kansas Legislature, the Attorney General wrote an opinion on (among others) which population figures should be used in reapportioning the five Kansas Congressional Districts. The opinion was as follows:

### WHICH CENSUS TO USE

"The United States Supreme Court has not been called upon to rule specifically on the question of what particular census figures are to be used in drawing up congressional districts. This question apparently has not been raised in the

other cases arising in this rapidly developing area of the law. The 1960 federal census appears to have been used in the recent decisions which have been examined. However, this is in part explainable by the fact that many states do not take a state census such as is taken annually in Kansas under the authority of G.S.1949, 11–101. Also, many of these decisions grew out of cases which began, as legislative acts which were passed not long after the 1960 federal census had been published. There have undoubtedly been changes in our state's population since 1960, both in terms of growth and population shifting. Those are shown by an examination of the annual state census figures of the past five or ten years. Our three judge federal district court admitted evidence of the 1962 and 1963 state census figures in the Meeks v. Anderson case, supra.

"Since the underlying philosophy expressed by the United States Supreme Court is to achieve equality between districts for purposes of voting, it would seem that the most up-to-date population figures should be used since the practical effect of the redistricting will not be felt until the votes are cast in November, 1966.

"The more recent state figures show changes which tend to make the 1960 federal census figures somewhat irrelevant if the "goal" is to achieve mathematical balance at the time the votes are cast. It appears reasonable also that 1960 federal figures will tend to become even less relevant to this purpose with the passage of time. It would appear more realistic to use the 1964 state census figures. Consideration has been given to some differences in the criteria for taking the federal and state census. Under the state practice college students, for example, are counted at their home rather than at the college or university. Kansas military personnel are counted here even though stationed outside the state. The federal census counts college students on the campus and includes military personnel stationed here, whether residents or not—it does not count Kan-

sans in the military and stationed outside the state. The total variation caused by these differences would not appear to be substantial.

"The Virginia Supreme Court of Appeals in an opinion handed down January 18, 1965, raised the question of whether it was permissible to exclude military-related personnel in congressional districting. There were over 335,000 military related persons in Virginia. The court pointed out that these persons had been counted in allocating the number of congressmen to Virginia. This court made reference to a statement by Chief Justice Warren in Davis v. Mann, [377 U.S. 678, 84 S.Ct. 1441] 12 L.Ed.2d 609 (June 15, 1964), a state legislative apportionment case, wherein Justice Warren rejected an argument that military personnel could be excluded in computing population merely on the basis that they were "military personnel" and "without more being shown." It is not clear whether the Chief Justice meant that if it could be shown that they were non-residents of Virginia they could have been excluded but that absent any proof in the record of this non-residency they should be counted. However, he went on to state that "even if such persons were to be excluded in determining the populations of the various legislative districts" the population variance still could not be constitutionally explained. There is no unequivocal statement that non-resident military personnel have to be counted.

"Population trends as shown by clear-cut, convincing statistics might be a factor which the legislature could consider. This point was raised in Calkins v. Hare, [228 F.Supp. 824] supra, but rejected by the court because there was no evidence in the legislative history of the re-districting act to show that the legislature openly and overtly considered population trends. In this regard the court said:

'Any districting, however, disparate with respect to population, may conceivably be justified by saying that the Legislature expected the area to either shrink or to grow. If such a

suggestion, without more, suffices to justify gross population disparities, then an easy answer to a constitutional denial has indeed been found. We do not intimate that population trends either are or are not significant and useable. But the difficulty in respect of their use is that a basic constitutional right may be lost to a speculative future event, an unequal trade at best and at worst a cynical deprivation. The proof of a "trend" must be compelling, immediate, and inescapable to justify disfranchisement. We find here, on the other hand, no proofs whatever.' (l. c. 828.)

"In conclusion, if the legislature wishes to take into account population trends and other factors influencing population, such as military personnel locations within the state, it is strongly urged that it make it clear upon the legislative record that it is considering these factors.* "

## ANALYSIS OF KANSAS CONGRESSIONAL DISTRICTS AS ENACTED BY 1965 LEGISLATURE

I. 1964 State Census.

Total 2,180,533
Ideal 436,107

| | Pop. | Var. from ideal | % over | % under |
|---|---|---|---|---|
| Dist. 1 | 441,873 | + 5,766 | 01.322 | |
| Dist. 2 | 436,085 | — 22 | | 00.005 |
| Dist. 3 | 427,617 | — 8,490 | | 01.947 |
| Dist. 4 | 442,677 | + 6,570 | 01.507 | |
| Dist. 5 | 432,281 | — 3,826 | | 00.877 |

Ratio of largest district (No. 4) to smallest (No. 3):
1.035 to 1

II. 1960 Federal Census.

Total 2,178,611
Ideal 435,722

| | Pop. | Var. from ideal | % over | % under |
|---|---|---|---|---|
| Dist. 1 | 435,145 | — 577 | | 00.132 |
| Dist. 2 | 450,661 | +14,939 | 03.429 | |
| Dist. 3 | 394,056 | —41,666 | | 09.563 |
| Dist. 4 | 459,063 | +23,341 | 05.357 | |
| Dist. 5 | 439,686 | + 3,964 | 00.910 | |

Ratio of largest district (No. 4) to smallest (No. 3):
1.165 to 1

———————◆———————

* Attorney General's Memorandum, Re: *Congressional Apportionment Guidelines*, February 9, 1965.