Craig TRAVIS, Faith Evans, Carmen Bostick, George Starbuck, Les Skillings, Laura Bolles and Dave Ellis, Plaintiffs,

and

Alice Scott, Anne F. Lee and Rhoda Miller, Plaintiffs in Intervention,

v.

Jean KING, Lieutenant Governor of the State of Hawaii; Ruben P. Mallari, John E.K. Akana, Franklin S. Kometani, Robert A. McFarlane, Franklin M. Mukai, Tom Okuda, D.W. Rose, James V. Hall and Carla Coray, Defendants.

HAWAII COUNTY COMMITTEE, Democratic Party of Hawaii, Catherine Filson, Frances Hasegawa, Dixie Kaetsu, Leslie Hill, William Kikuchi, Takeshi Kudo, Tracey Lauder, Luther Nathaniel, Sr., John Santangelo and James Simpson, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Jean KING, in her capacity as Lieutenant Governor and Chief Elections Officer of the State of Hawaii, Defendant.

Civ. Nos. 81–0433, 81–0438.

United States District Court,
D. Hawaii.

Oct. 13, 1982.

John S. Carroll, David A. Ezra, Michael F. O'Connor/Steven Thomas, Honolulu, Hawaii, for Craig Travis et al.

Peter J. Herman, Charles H. Hurd, Welcome S. Fawcett, Honolulu, Hawaii for intervenors Lee, Scott and Miller.

Tany S. Hong, Atty. Gen. by Francis Paul K.A. Keeno, Deputy Atty. Gen., James T. Funaki, Honolulu, Hawaii, for defendants.

Steven K. Christensen, Hilo, Hawaii, William J. McCarthy, Jr., Kealakekua, Hawaii, Wayne C. Metcalf, III, Robert P. Marx, Hilo, Hawaii, for Hawaii County Committee et al.

Before CHAMBERS, Circuit Judge, and KING and WILLIAMS, District Judges.

## OPINION

### SPENCER WILLIAMS, District Judge:

In 1962, the United States Supreme Court found the issue of legislative malapportionment justiciable.[1] Since that time, efforts by the State of Hawaii to redraw the lines of local, state and congressional districts have been subjected to numerous attacks in both state and federal courts.[2] The present action involves a challenge to the state's most recent reapportionment effort, its 1981 legislative and congressional reapportionment plan as embodied in the Report and Reapportionment Plan of the 1981 Reapportionment Commission (1981 Plan), submitted to the state's Lt. Governor on September 28, 1981.

Plaintiffs and intervenors claim the 1981 Plan violates both State and Federal Constitutional provisions. The imminence of the upcoming 1982 primary and general elections mandated that this litigation be handled expeditiously.[3] The court, therefore, ordered the parties to submit all evidence in written form, in lieu of any live testimony. Oral argument on the matter was held before the full court on March 24, 1982. By its interlocutory order, dated March 25, 1982, the court announced its decision that (1) as it pertains to the state legislature's reapportionment, the 1981 Plan violates the equal protection clause of the fourteenth amendment of the United States Constitution and (2) as it pertains to the congressional reapportionment, the 1981 Plan violates article 1, § 2 of the United States Constitution as well as the equal protection clause of the fourteenth amendment.[4] The order stated that a full opinion would be issued at a later date. The following memorandum constitutes that opinion.

## THE FACTS

The State of Hawaii's previous efforts at reapportionment, on both state and local

1. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

2. *Holt v. Richardson*, 238 F.Supp. 468 (D.Haw. 1965) and 240 F.Supp. 724 (1965), and same case *sub nom. Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966) (challenging the 1959 state legislative reapportionment plan); *Burns v. Gill*, 316 F.Supp. 1285 (D.Haw.1970) (challenging the 1968 state legislative reapportionment plan); *Boshard v. 1973 Legislative Reapportionment Commission*, 55 H. 89 (1973) (challenging the state's 1973 reapportionment plan); *Leopold v. State of Hawaii*, Civ. No. 72–3582 (D.Haw.1974) (challenging the apportionment of local school board seats); and *Hirabara v. Doi*, Civ. No. 76–2045 (D.Haw. 1976) (challenging the 1970 congressional redistricting).

3. The state primary election is scheduled for September 18, 1982. The general election is scheduled for November 2, 1982. According to the state, May 1, 1982 was the last date by which the chief election officer of the state had to have an approved reapportionment plan. If received after this date, the state felt that the scheduled elections would have to be postponed. The Masters appointed by the court to aid in the formulation of a remedy in this case (see order of appointment, April 7, 1982) agreed with the state that May 2, 1982 was the deadline.

4. Specifically, the interlocutory order stated:
   1. As it applies to the State Senate and House of Representatives, the 1981 Reapportionment Plan's deviation in the number of registered voters per elected official between the districts violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.
   2. As it applies to the State Senate and House of Representatives, the 1981 Reapportionment Plan fails to properly define and calculate a permissible population basis as required by the Equal Protection Clause of the Fourteenth Amendment and *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).
   3. The defendants have not met their burden of showing that "the distribution of registered voters approximates distribution of state citizens or another permissible population base." *Burns v. Richardson*, 384 U.S. 73, 95, 86 S.Ct. 1286, 1298, 16 L.Ed.2d 376 (1966).
   4. As it applies to the State Congressional districts, the 1981 Reapportionment Plan violates both Article I, Section 2 of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.
   To the extent this opinion enlarges on or modifies the interlocutory order that order is hereby deemed amended. Since we found that the state's plan violated these Federal Constitutional standards, we found it unnecessary to address the other challenges raised, including the numerous challenges based on applicable state law.

levels, are well documented in prior decisions of this and other courts.[5] The present effort began in March of 1981 with the formation of the 1981 Reapportionment Commission pursuant to article IV, § 2 of the Hawaii State Constitution. As to reapportionment of the state legislature, the state constitution directed the Commission to perform two primary tasks:

> First, it was required to apportion the total number of seats in the State senate and the State house of representatives among the basic island units of the State. Second, it was required to apportion the members allocated to each basic island unit among the districts therein and to redraw district lines where necessary in such a manner that for each house the average number of registered voters per member in each district is as nearly equal to the average for the basic island units as practicable.[6]

The four basic island units of the state are Oahu, Maui, Hawaii and Kauai.[7] The state constitution requires that the "method of equal proportions" be used to apportion representatives of both houses among the basic island units.[8] The constitution also prohibits districts which cross basic island unit lines. The result is an allocation of legislators most nearly proportional to the actual population figures of each basic is-

land units with each unit receiving at least one seat in each house.

As to the state's two congressional seats, state law requires that the Commission draw districts "in such a manner that the average number of registered voters per member district shall be as nearly equal as practicable."[9]

With these and other state and federal limitations in mind, the Commission proceeded to reapportion the state. Using voter registration figures from 1980, the Commission first distributed the twenty-five senate and fifty-one house seats among the four basic island units, using the method of equal proportions. The results were as follows:

| SENATE | | HOUSE | |
|---|---|---|---|
| Basic Island Unit | No. of Senators | Basic Island Unit | No. of Rep's |
| Hawaii | 3 | Hawaii | 6 |
| Maui | 2 | Maui | 5 |
| Oahu | 19 | Oahu | 37 |
| Kauai | 1 | Kauai | 3[10] |

The Commission then attempted to draw district lines within each basic island unit so that "deviations from the basic island unit's average number of registered voters per legislator . . . [would] be as low as practicable."[11] Once these lines were drawn, the Commission endeavored to test the results pursuant to *Burns v. Richardson*, 384 U.S.

---

**5.** See note 1 *infra*.

**6.** Report and Reapportionment Plan of the 1981 Reapportionment Commission 8 (hereinafter "Report").

**7.** The court notes that the basic island unit of Maui actually includes four separate islands, Maui, Molokai, Lanai, and Kahoolawe, and the basic island unit of Kauai includes both Kauai and Niihau. Thus, the basic island units do not represent four distinct contiguous land masses.

**8.** Hawaii State Constitution, Article IV, § 4.

**9.** Section 25–2(b) of the Hawaii Revised Statutes. See Report at 33–35. In addition to requiring equal numbers of registered voters in each district, Section 25–2(b) also states the following as criteria to guide the Commission in establishing congressional lines:

> (1) No district shall be drawn so as to unduly favor a person or political faction.

(2) Except in the case of districts encompassing more than one island, districts shall be contiguous.
(3) Insofar as practicable, districts shall be compact.
(4) Where possible, districts lines shall follow permanent and easily recognized features such as streets, streams and clear geographical features, and when practicable, shall coincide with census tract boundaries.
(5) Where practicable, state legislative districts shall be wholly included within congressional districts.
(6) Where practicable, submergence of an area in a larger district wherein substantial different socio-economic interests predominate shall be avoided.
Similar state law standards applied to the legislative reapportionment. See Report at 10.

**10.** Report at 16.

**11.** Report at 10–11.

73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).[12] The *Burns* Court held that registered voters could be used as a base population for apportioning a state legislature but only if it is shown that the resulting plan produces "a distribution of legislators not substantially different from the use of a permissible population basis." *Id.* at 93, 86 S.Ct. 1297. The Commission determined that "resident-eligible-voters" (eligible voters) is a constitutionally permissible population base for apportionment purposes but found that data on this base was either unavailable or difficult to extrapolate from existing information. It decided, however, that the state's distribution of civilians closely approximated the distribution on eligible voters. While civilian population is not a permissible population base [13] the Commission decided to use it as a means of determining whether their registered voter based apportionment substantially approximated one based on eligible voters, the intended population base.[14]

The Commission was able to compare the *inter*island distribution of legislators based on both eligible voters and civilian citizens. It did not attempt, however, to determine civilian populations for any of the individual districts or for either of the congressional districts, nor were any comparisons made between civilians and registered voters on a district by district basis. As discussed *infra,* the evidence submitted shows that the Commission was satisfied that the plan met all federal standards because: (1) legislative districts were substantially equal in numbers of registered voters compared to basic island unit and statewide averages of registered voters per legislator; (2) use of a civilian population base would have resulted in substantially the same distribution of legislators *among* the basic island units; and (3) the congressional districts contained almost equivalent numbers of registered voters.

The final plan submitted was based on the state's 1980 registered voter population of 402,795. As a result, the statewide average number of registered voters per senator was 16,112 while the statewide average number of registered voters per representative was 7,898. The districting plan adopted for the state house of representatives called for twenty-eight representative districts, consisting of six single-member districts, twenty-one two-member districts and one three-member district. The state senate districting plan called for eight districts, consisting of one single-member district, one two-member district, two three-member districts and four four-member districts. The actual registered voter population for each of the eight senate and twenty-eight house districts are set forth in *Appendix A* of this opinion. Included also are the deviations from the basic island and statewide ideals on a district by district basis.

According to the Commission's calculations, the most populous senate district, district eight, consisting of the basic island unit of Kauai and apportioned one senator, contains 21,732 registered voters. Compared to the statewide average number of registered voters per senator, senate district eight is overpopulated by 34.88%. In contrast, the most underpopulated senate district, district six consisting of part of Oahu and containing four senators, has 14,775 registered voters per senator. Compared to the statewide average, senate district six is underpopulated by 8.30%. The result is a maximum deviation of 43.18% between the state's most underrepresented and overrepresented districts.

In the house, the most populous district is district twenty-three located on the island of Oahu and apportioned two representatives, each representing 8,509 registered voters. Compared to the statewide averages, district twenty-three is overpopulated by 7.74%. The most underpopulated house district is district twenty-eight consisting of

---

**12.** Report at 11–15.

**13.** *Davis v. Mann,* 377 U.S. 678, 690, 84 S.Ct. 1441, 1447, 12 L.Ed.2d 609 (1964).

**14.** The Commission calculated the state's civilian population by subtracting all military and military dependents from its total or census population.

the island of Kauai and apportioned three representatives, each representing 7,244 registered voters. Compared to the state-wide average, district twenty-eight is underpopulated by 8.28%. The result is a maximum deviation of 16.02% between the most overrepresented and the most under-represented house districts.

## DEVIATIONS IN THE STATE LEGISLATURE REAPPORTIONMENT PLAN

In *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the United States Supreme Court overruled its prior holding that a legislative malapportionment claim presents a "political question" and is thus non-justiciable. The Court found that such claims could be sustained under the equal protection clause of the fourteenth amendment. While *Baker v. Carr* recognized that a cause of action existed for legislative mal-apportionment, the decision was silent as to what standards a lower court should apply to such claims. This need was partially answered in the subsequent case of *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964), wherein the Court stated that "as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." As further stated by the Court, "Population is, of necessity, the starting point for consideration and the controlling criterion for judgment on legislative apportionment controversies." *Id.* at 567, 84 S.Ct. at 1384.

While *Reynolds v. Sims* established population as the overarching principle to be applied in all such cases, the Court acknowledged that establishment of a rigid mathematical equality standard "is neither practicable nor desirable." *Roman v. Sinock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964) (decided the same day as *Reynolds v. Sims* ); *accord, Mahan v. Howell,* 410 U.S. 315, 324–25, 93 S.Ct. 979, 985, 35 L.Ed.2d 320 (1972). Instead, the Court found "the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual state whose legislative apportionment is at issue,

there has been a faithful adherence to a plan of population based representation, with such *minor* deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination." *Id.* (emphasis added).

Relying on language from these and subsequent opinions, the state argues that the deviations present in the 1981 Plan are justified by the state's desire to preserve the physical integrity of the four basic island units so as to provide each unit meaningful representation in the state legislature. In *Reynolds v. Sims,* the Court expressly recognized that minor deviations in a state legislative plan could be justified as a means of providing political subdivisions a certain degree of representation *as* political subdivisions. The Court cautioned, however, that if "as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." *Reynolds v. Sims,* 377 U.S. at 581, 84 S.Ct. at 1391. The extreme deviations present in the *Reynolds* cases made application of this general principle unnecessary. Subsequent cases, however, have sketched out the boundaries of this limited exception to a strict population based system of apportionment.

In *Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967), the Supreme Court had before it a reapportionment plan for the Texas state legislature which included a maximum deviation of 26.48%. The district court approved the plan relying, in part, on the state's policy of using county lines whenever possible in drawing legislative districts. The Supreme Court overturned the decision on alternative grounds but, in dicta, expressed strong reservations over whether "deviations evident here are the kind of 'minor' variations which *Reynolds v. Sims* indicated might be justified by local policies counseling the maintenance of

established political subdivisions in apportionment plans." *Id.* at 123, 87 S.Ct. at 822.

In *Abate v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), the Supreme Court approved the Rockland County, New York Board of Supervisors' 1968 reapportionment plan, despite the fact that use of the plan resulted in a maximum deviation from population equality of 11.9%. Citing *Reynolds v. Sims,* the Court upheld the plan, in part, because of the expressed desire of the county to preserve existing political subdivisions. While affirming use of this particular plan, the Court warned that "nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality." *Id.* at 187, 91 S.Ct. at 1907.

Finally, in *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Court considered the constitutionality of Virginia's 1971 reapportionment plan. The plan resulted in a maximum deviation of 16.4% in one of the state's legislative houses. The sole rationale advanced by the state as justification for this deviation was a consistent, historical state "policy of maintaining the integrity of political subdivision lines in the process of reapportioning the state legislature." *Id.* at 329, 93 S.Ct. at 987. The Court upheld the plan as constitutional based on uncontroverted evidence that the "plan, subject to minor qualifications, produces the minimum deviation above and below the norm, keeping intact political boundaries . . . ." *Id.* The Court issued a caveat, however, that "this percentage may well approach tolerable limits." *Id.*

The *Mahan* Court laid out a three step method for analyzing state offered justifications for seemingly substantial population deviations. First, the reason advanced must be a rational one, "free from any taint of arbitrariness or discrimination." *Id.* at 325, 93 S.Ct. at 985 (*quoting Roman v. Sincock,* 377 U.S. at 710, 84 S.Ct. at 1458).

"The inquiry then becomes whether it can reasonably be said that the state policy urged [as a justification for] the divergences in the legislative reapportionment plan . . . is, indeed, furthered by the plan adopted by the legislature." *Id.* at 326, 93 S.Ct. at 986. Finally, "if so justified," the issue is whether "the divergences are also within tolerable limits." For no matter how rational a state justification may be, it "cannot constitutionally be permitted to emasculate the goal of substantial equality." *Id.*

In applying this test to the facts of the case, the *Mahan* Court first declined to find that Virginia's decision to grant the state legislature "the power to enact local legislation dealing with the political subdivisions is irrational." *Id.* Based on "uncontradicted evidence," the Court accepted the argument that the plan before them included the minimum deviations possible consistent with achievement of the state's policy. Finally, as noted, the Court held that the "16-odd percent maximum deviation" did not violate the equal protection clause. *Id.* at 329, 93 S.Ct. at 987. Again, however, the Court warned that "this percentage may well approach tolerable limits." *Id.*

█  Following the method of analysis expounded by the *Mahan* Court, we turn first to the question of whether the expressed reason given by the state for the present deviations is a rational one. As noted, the primary rationale advanced by the state in support of the deviations is its desire to provide each basic island unit with meaningful representation in the two state houses.[15] Based on the unique geographic and economic insularity of the four basic island units, along with the state's simplified and centralized form of government, we find that the state's policy is a rational one.

The question then becomes whether the 1981 Plan reasonably serves to advance this stated policy. *Mahan v. Howell,* 410 U.S. at 328, 93 S.Ct. at 987. In finding that the State of Virginia's reapportionment plan furthered the state's policy of preserving

---

15. For a thorough discussion of the state's policy and its underlying reasoning, see *Burns v.*

*Gill,* 316 F.Supp. at 1290–93.

existing political subdivisions, the *Mahan* Court relied almost exclusively on uncontradicted evidence which indicated that the plan contained the smallest deviation possible consistent with implementation of the state's policy. No such evidence was presented in this litigation. To the contrary, the Commission's own report clearly shows that a substantial portion of the deviation in each house is totally unrelated to the state's policy of preserving the geographic unity of the four basic island units. Instead, this portion of the deviation in both houses results from the state's apparent unwillingness to minimize the population deviations among the legislative districts *within* the basic island unit of Oahu.

Approximately three-fourths of the state's residents live on the island of Oahu. Under the method of equal proportions, the island still retains the lion's share of state representatives, nineteen of the twenty-five senators and thirty-seven of the fifty-one representatives. In light of these relatively large numbers, it would seem that Oahu's legislative districts could have easily been drawn with only minimal population variations. The 1981 Report supports this suspicion. According to the Commission figures, the average number of registered voters per senator on Oahu deviates from the statewide norm by only 2.81%; in the house of representatives the deviation is even less at 1.82%.[16]

Despite these relatively low average deviations, the districts drawn on the island cover a substantial range of deviations. The maximum deviation between Oahu's senate seats is 9.18%. The maximum deviation between Oahu's house seats is even greater at 9.54%. Clearly, these intraisland deviations are not the result of adherence to the state's policy of providing each island unit with meaningful representation. The state provides no other reason for these deviations. The lack of a stated justification is by no means accidental. Citing

*White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Commission contends that the deviations present on Oahu are constitutionally *de minimis* and thus need no expressed justification.[17] In *White* and other cases, the Court has stated that maximum deviations of 10% in a reapportionment plan are *de minimis* and need no state justification since they are *prima facie* constitutional.[18] This rule of thumb, however, applies to the maximum deviation present in an *entire* reapportionment scheme. There is no support for the state's proposition that this standard can be used to compare and justify deviations between or within the geographical or political subdivisions of a state. *Cf. Wells v. Rockefeller,* 394 U.S. 542, 544, 89 S.Ct. 1234, 1236, 22 L.Ed.2d 535 (1969) (rejecting argument that congressional reapportionment was proper since population variances between seven multi-district regions were minimal when large deviations still existed between individual districts throughout the whole state). As discussed, the total deviations present in the 1981 Plan for both state houses plainly exceed the *de minimus* standard of *White v. Regester.* The entire plan is thus suspect and all deviations substantially adding to the maximum deviation must be justified with expressed reasons.

Assuming the state could have drawn districts of equal populations on Oahu—and no evidence to the contrary was presented— the maximum deviations in both houses would have been substantially reduced. In the senate, the maximum range would be 37.67% not 43.18%. In the House, the maximum deviation would be only 11.1%, not the present 16.02%.

By failing to keep deviations to a minimum on Oahu, the state allowed the maximum deviation in the house to increase by almost fifty percent over the deviation resulting strictly from the use of the method of equal proportions to distribute seats

---

16. Report at 32.

17. Report at 27.

18. *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1970); *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Chapman v. Meir,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

among the islands. Based on this substantial and wholly unjustified increase in total deviation, we find that the state plan, as it relates to the state house of representatives, fails to reasonably further the state's expressed policy and is thus unconstitutional.

The proportionate increase in the total senate deviation related to Oahu's deviations is not nearly as dramatic as in the state house of representatives due to the limited number of senate districts and the already large deviation related directly to the state's policy of using the method of equal proportions to distribute seats. It may well be that even this relatively small shift in deviation means that the 1981 Plan, as it relates to the state senate, fails to reasonably further the state's expressed policy. The court need not address this issue, however, for assuming a valid connection between the state's policy and the reapportionment plan for the state senate, we find that the total deviation present in the redistricting of the senate, 43.18%, is facially violative of the equal protection clause.[19]

Defendants have failed to cite a single post-*Mahan* case in which a deviation of this magnitude has been upheld. In fact, as far as we can ascertain from independent research, it appears that no court since *Mahan* has upheld a legislative reapportionment scheme which includes a maximum deviation of 16.5% or more. Apparently most courts have read the Supreme Court's caveat in *Mahan* as implicitly setting this figure as the outermost limit allowed by the Constitution.[20]

The most illustrative of these cases is the recent Virginia three-judge court decision in *Cosner v. Dalton,* 522 F.Supp. 350 (1981). Plaintiffs in that action challenged the Virginia legislative reapportionment plan of 1980 on many of the same grounds raised in the instant action. Their chief argument was that the 1980 plan's maximum deviations of 22.12% in one house and 27.12% in the other were facially unconstitutional. In support of these deviations, the State of Virginia relied on the same justification that sustained the deviations present in the *Mahan* case. The *Cosner* court carefully reviewed the *Mahan* decision as well as

**19.** Since we have determined that the deviations present in the house plan are not substantially related to the state policy of providing each basic island unit with meaningful representation, we do not address whether, assuming such a relationship, the 16.02% deviation in the house exceeds permissible constitutional standards.

A related issue raised by intervenors should be at least briefly noted, however. Throughout this section we have assumed that population deviations can be calculated and compared on the basis of the number of registered voters per district. Intervenors contend that deviations must be calculated and compared only on the basis of total population or some other permissible population base. Based on our reading of *Burns,* however, we decline to impose such a requirement on the state. Nonetheless, it does not follow from this conclusion that a court should ignore the fact that deviations challenged as impermissible are based on registered voters rather than an appropriate base. Since *Reynolds,* the Court has made it clear that population is the standard by which maximum deviations are to be examined. District populations based on registered voters, however, can only approximate permissible populations. As approximations, there will always be an unavoidable margin of error.

This margin of error, of course, will only be important if the deviations in question approach the outer limits beyond which a deviation is *de facto* unconstitutional. For example, as discussed, the Court has stated that deviations of less than 10% will be considered *prima facie* constitutional. It may be that, considering the margin of error present in a registered voter based apportionment, a maximum deviation approaching but not exceeding 10% in such a plan should nevertheless be supported by an expressed state rationale. Likewise, assuming 16.5% is the maximum deviation permitted by the Constitution regardless of any proffered state justification, a deviation of 16.02% in such a plan, may be considered excessive if the plan is based on registered voters.

Therefore, while the court declines from requiring that comparisons of districts always be on a permissible population basis, we find that comparisons based on registered voters should be subjected to a higher degree of scrutiny, at least when the deviations present begin to approach constitutional limits.

**20.** For a review of post-*Mahan* cases, see Guido, *Deviations and Justifications: Standards and Remedies in Challenges to Reapportionment Plans,* 14 Urban Lawyer 57, 64–71 (1981).

numerous other Supreme Court decisions dealing with population variance and concluded that the deviations present in the new plan exceeded constitutionally permissible limits and could not be supported by any combination of state urged justifications. We find the reasoning in *Cosner* persuasive and thus hold that the total deviation present in the senate reapportionment plan exceeds the limitations allowable under the equal protection clause.

Mindful of the implied outer limit set by the Supreme Court in *Mahan,* the state concedes that "at first glance" the total deviation of 43.18% in the senate appears to exceed constitutional limits. The state, however, urges the court to ignore this deviation and the deviation present in the house of representatives. Instead of analyzing each house separately, the state maintains that the reapportionment of both the senate and the house of representatives should be analyzed together and cite a table from the Commission's report which allegedly indicates that the deviations present in both houses are largely offsetting.[21]

In support of this method of analysis, the state cites the following language from *Reynolds v. Sims:* "apportionment in one house [of a bicameral legislature] could be arranged so as to balance off *minor inequities* in the representation of certain areas in the other house." 377 U.S. at 577, 84 S.Ct. at 1389 (emphasis added). In light of the many post-*Reynolds* decisions which have discussed and refined the concept of minimal population deviations, however, it cannot be seriously contended that the gross deviations presented in the 1981 Plan qualify as "minor inequities."

The state is unable to cite a single persuasive authority for the proposition that deviations of this magnitude can be excused by combining and figuring deviations from both houses.[22] The court finds that the stated argument on this point fails to justify the deviations present in the 1981 Plan.

## USE OF REGISTERED VOTERS AS A POPULATION BASE

Prior to *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1965), the Supreme Court had cautiously avoided defining the scope of the term "population" as it pertained to reapportionment. In discussing *Reynolds v. Sims,* the *Burns* Court conceded that this omission was an intentional one. According to *Burns,* while "total population figures were in fact the basis of comparison in [*Reynolds v. Sims*] ... our discussion carefully left open the question what population was being referred to. At several points, we discussed substantial equivalence in terms of voter population or citizen population, making no distinction between the acceptability of such a test and a test based on total population." *Id.* at 91, 86 S.Ct. at 1296. The *Burns* decision did not completely resolve this dilemma, but it did address the limited question of whether voters, either actual or registered, are a constitutionally permissible population base for apportionment purposes.

The Court held that use of either an actual or registered voter basis was constitutionally prohibited, in part, because both bases depended "not only upon criteria such as govern state citizenship, but also upon the extent of political activity of those eligible to register and vote." *Id.* at 92, 86 S.Ct. at 1296. The Court decided that both bases were thus subject to manipulation by those with "political power" so as to perpetuate underrepresentation of certain groups or to perpetuate a "ghost of prior malapportionment." *Id.* at 93, 86 S.Ct. at 1297 (citing *Buckley v. Hoff,* 243 F.Supp. 873, 876 (D.C. Vt.1965)). Aside from the possibility of intentional manipulation, the Court also found that the number of actual or registered voters in a state may fluctuate severely over time as a result of purely "for-

---

21. Report at 28.

22. The state cites *Burns v. Gill* 316 F.Supp. 1285 (D.Haw.1970), for support since the court in that case approved a plan including deviations of 29.6% and 31.3%. This opinion, how-

ever, predates the Supreme Court's decision in *Mahan.* It is therefore of little precedential value as to this issue. Moreover, the deviation present in the senate plan substantially exceeds the deviations approved in *Burns v. Gill.*

tuitous factors [such] as a peculiarly controversial election issue, a particularly popular candidate, or even weather conditions." *Id.* at 93, 86 S.Ct. at 1297 (citing *Ellis v. Mayor & City Council of Baltimore*, 352 F.2d 123, 130 (4th Cir.1965)). The possibility of wide fluctuations are of particular concern, the Court noted, in cases, such as the present one, in which "registration figures derived from a single election are made controlling for as long as 10 years." *Id.*

Despite these limitations, the Court did not prohibit completely reapportionments based on registered voters. While holding that registered voters could not be the "intended" base of an apportionment, the Court found that such figures could be used to apportion a state legislature if it was shown that the resulting plan "produced a distribution of legislators not substantially different from the use of a permissible population basis." *Id.*

In determining whether the plan before it met this standard, the *Burns* Court began by noting that the state felt registered voters reasonably approximated both citizen and total populations in the state. Emphasis was also placed on the fact that a "high portion of the [state's] possible voting population is registered and strong drives to bring out the vote have resulted in" consistently high voter turnouts. *Id.* at 96, 86 S.Ct. at 1299. The Court concluded that "in these circumstances, we find no demonstrated error in the district court's conclusion that the apportionment achieved by use of a registered voters basis substantially approximated that which would have appeared had state citizen population been a guide." *Id.* at 96, 86 S.Ct. at 1299.

In upholding the state's plan, the Court made it clear that the validity of registered voter based reapportionments had not "been established for all times or circum-

stances, in Hawaii or elsewhere." *Id.* at 96, 86 S.Ct. at 1299. Moreover, several guidelines were "suggested" for increasing the accuracy of such apportionments, including districting more often than every ten years, use of presidential election year figures and use of a permanent system of registration. Finally, the Court emphasized that its decision was based, in large part, on the lack of any evidence in the record before it questioning the relationship between use of a registered voter base and use of a citizen population base. It left open the possibility that "[f]uture litigation may reveal infirmities, temporary or permanent, not established by the present record." *Id.* at 97, 86 S.Ct. at 1299. The Court concluded that "with a view to its interim use, Hawaii's registered voter basis does not on this record fall short of constitutional standards." *Id.*

A question raised but not answered in *Burns* is how specific the comparison with a permissible population must be to prove a "substantial approximation." Intervenors maintain that the *Burns* decision and its progeny require the state to calculate and compare the two populations on a district by district basis. Alternatively, intervenors insist that the state should, at least, be required to prove that estimating the "permissible" populations for each district is impracticable.

In support of the first proposition, intervenors cite numerous state and federal court decisions which they contend require the state to make district-by-district comparisons.[23] A thorough review of these authorities, however, indicates that all of these cases are either distinguishable or inconclusive on this particular point. The Court in *Burns* obviously did not require such a comparison, at least not as an absolute prerequisite to validating a registered

---

**23.** *Marshall v. Edwards*, 582 F.2d 927 (5th Cir. 1978); *Zimmer v. McKeithen*, 485 F.2d 1297, at 1302–03, fn. 11 (5th Cir.1973); *Kapral v. Jensen*, 271 F.Supp. 74 (D.Conn.1967); *Cohen v. Maloney*, 410 F.Supp. 1147, 1153, fn. 9 (D.Del. 1976); *Priesler v. Mayor of City of St. Louis*, 303 F.Supp. 1071 (E.D.Mo.1969); *Calderon v. City of Los Angeles*, 4 Cal.3d 251, 93 Cal.Rptr.

361, 481 P.2d 489 (1971); *D'Adamo v. Cobb*, 27 Cal.App.3d 448, 103 Cal.Rptr. 813 (1972); *Hartman v. Denver*, 165 Colo. 565, 440 P.2d 778 (Colo.S.Ct.1967); *Warren v. North Tonawanda*, 60 Misc.2d 593, 303 N.Y.S.2d 945 (Sup.Ct., Niagara County, N.Y.1969); *In re Township of Penn Hills, County of Allegheny*, 216 Pa.Super. 327, 264 A.2d 429 (1970).

voter based apportionment. In the absence of any persuasive authority to the contrary, the court declines to hold that a district-by-district comparison is required before a state's use of a registered voter base will ·be upheld.

█ Intervenor's second contention deserves closer scrutiny. In *Burns,* the Court did not address the question since it assumed state citizen figures were unavailable. Considering the Court's cautious approval of a registered voter base, there is some merit to the argument that the state at least show the impracticality of a district-by-district comparison before being permitted to go forward with a registered voter based apportionment. We need not address this issue, however, for it is clear from *Burns* that, at the very least, the state is obligated to provide some degree of proof that the proposed plan approximates the results of a plan based on an appropriate population base. A review of the full record in this case shows that the state has failed to meet this burden.

Under *Burns,* the state bears at least the initial burden of coming forth with some evidence that the proposed apportionment substantially duplicates the results of one based on a permissible population base. The state's ultimate burden of proof, however, will vary depending on the amount of contrary evidence submitted. In *Burns,* there was apparently no challenge to the state's claim that the registered voter apportionment accurately reflected one based on state citizens.. Absent such a challenge,

the level of evidence submitted in *Burns* is obviously all that is required of a state. The state's ultimate burden of proof must increase, however, to the degree that a challenger successfully raises doubts about the accuracy of a proposed plan. In *Burns,* for example, the Court specifically stated that evidence indicating large discrepancies in registration based on income could call into question a plan that appears otherwise valid.[24] If such evidence had been admitted, the state would have been obligated to come forward with more specific evidence of the plan's accuracy or face having the plan declared invalid.

As discussed more fully below, even if we assume the state has met its initial burden of coming forth with sufficient evidence to support its plan's accuracy, plaintiffs and intervenors have successfully rebutted this showing and in turn have made a strong showing that the plan is in fact fatally flawed. The state is' unable to overcome this showing and thus we find the state's use of registered voters constitutionally impermissible.

In their memorandum, the state alleges the Commission "made every reasonable effort to make the registered voter base reflective of some other permissible population base, such as state citizen population and eligible voter population." Assuming *arguendo* that eligible voters constitute a permissible population base,[25] we turn first

**24.** *Burns v. Richardson,* 384 U.S. at 97 n. 25, 86 S.Ct. at 1299 n. 25.

**25.** Since we have struck down the state's plan on alternative grounds, we do not pass on the validity of the state's intended population base—eligible voters. We note, however, that since *Reynolds* courts at all levels have held that use of voter blind populations, either total or state citizen populations, adequately serves the requirement of "one person, one vote." On the other hand, in *Burns,* the Court expressed clear misgivings about voter-based populations, at least ones based on registered or actual voters. Whether these same misgivings apply to eligible voters as well has never been ruled

on by the Supreme Court. At least one commentator, however, has stated that an eligible voter based apportionment would violate the holding and reasoning of *Reynolds v. Sims:*

If the Supreme Court ever affirms a standard of apportionment based on voters or those who may be eligible to vote, it will necessarily represent a determination that the use of total inhabitants as a base, as was demanded in *Reynolds,* is unconstitutional since, for example, if a district contains a university or mental institution which has people who are not eligible to vote, those eligible to vote in that district will necessarily · be unconstitutionally overrepresented. Note, *Reapportionment on the Sub-State Level of*

to deciding whether the state has produced enough evidence to meet at least the minimum burden of proof required by *Burns*. As support for the accuracy of the registered voter base, the state primarily relies on the findings in *Burns v. Richardson* and *Burns v. Gill* that population deviations resulting from the state's use of a registered voter base is most likely a result of the state's heavy non-citizen military population. In addition, the state relies on a Commission study which indicates that use of the intended population base, resident-citizen-eligible voters, would have resulted in substantially the same distribution of legislators *among* the four basic island units.

The court assumes for the sake of argument that these factors make out a *prima facie* showing of validity. In rebuttal, plaintiffs and intervenors rely on reports and studies which indicate that (1) rates of registration in the state do vary substantially among different socio-economic groups; (2) the rate of registration in the state as a whole has dropped off since *Burns;* and (3) the actual maximum deviations on Oahu alone, based on estimates of the "permissible populations" of each of the districts drawn, may exceed twenty percent. While this evidence by itself tends to rebut the state's initial showing of validity, even stronger evidence contrary to the state's position can be gleaned from facts and figures provided in the Commission's report itself. These figures, when properly analyzed, clearly indicate the existence of impermissible deviations between the 1981 Plan and one based on a permissible population.

As noted earlier, the state attempted to justify the use of a registered voter base by making it "reflective of some other permissible population base, such as state citizen population and eligible voter population." [26] The state assumed that potential or eligible

*Government: Equal Representation or Equal Vote?* 50 B.U.L.R. 231, 245 n. 71.

voters constitute a permissible base and adopted it as its intended base. The state's eligible voter population was not used for comparative purposes, either on a district, island unit or statewide basis for it concluded that such figures were either not available or difficult to approximate. The state determined, however, that the distribution of its non-military population throughout the state closely approximated the distribution of eligible voters throughout the state. Thus, the Commission concluded, "the distribution of legislators on the basis of civilian population . . . should give a reasonable standard by which we can judge whether or not the distribution of legislators on the basis of registered voters substantially approximates the distribution under the apportionment base of resident-citizen-eligible voters." [27]

The Commission was able to determine the civilian population for each of the four basic island units but made no effort to estimate the civilian population for any of the individual districts except, of course, those which encompassed an entire island unit. Using only the island unit figures, the Commission made just two limited calculations. First, it determined how the use of a civilian population base would have altered the distribution of legislators among the island units using the method of equal proportions. The resulting figures show that the distribution of senators among the island units would have been unaffected, while in the house, the basic island unit of Oahu would have gained two representatives, one each from the island units of Maui and Kauai.

After estimating the distribution of legislators among the islands based on a civilian population base, the Commission then determined the average number of civilians per legislator as to each island unit and the percent deviation between island and statewide averages. The results are as follows:

26. Report at 16.

27. Report at 15.

SENATE

| Basic Island Unit | No. of Senators | Civilian Population | No. of Civilians Per Senator | Percentage Deviation from State-wide Average |
|---|---|---|---|---|
| Hawaii | 3 | 91,749 | 30,583 | − 8.97 |
| Maui | 2 | 70,911 | 35,455 | + 5.53 |
| Oahu | 19 | 638,559 | 33,608 | + 0.03 |
| Kauai | 1 | 38,739 | 38,739 | + 15.30 |

HOUSE

| Basic Island Unit | No. of Rep's | Civilian Population | No. of Civilians Per Representative | Percentage Deviation from State-wide Averages |
|---|---|---|---|---|
| Hawaii | 6 | 91,749 | 15,292 | − 7.15 |
|  | [6] | — | [15,292] | [ − 7.15] |
| Maui | 4 | 70,911 | 17,728 | + 7.64 |
|  | [5] | — | [14,182] | [ − 13.89] |
| Oahu | 39 | 638,559 | 16,373 | − 0.59 |
|  | [37] | — | [17,258] | [ + 4.79] |
| Kauai | 2 | 38,739 | 19,370 | + 17.61 |
|  | [3] | — | [12,913] | [ − 21.60] [28] |

In the house table, the bracketed numbers on the far left indicate the distribution of representatives resulting from the use of a registered voter based population. The remaining bracketed numbers indicate each island unit's average number of civilians per representative and the percent deviation from the statewide average assuming the initial distribution of legislators was based on registered voters.

The importance of these figures can be seen by comparing them to similar calculations based on the registered voter based apportionment. That analysis results in the following figures:

SENATE

| Basic Island Unit | No. of Senators | No. of Registered Voters | Basic Island Unit Average Reg. Voters Per Senator | Percent Deviation from State-wide Average |
|---|---|---|---|---|
| Hawaii | 3 | 46,451 | 15,484 | − 3.90 |
| Maui | 2 | 37,079 | 18,540 | + 15.07 |
| Oahu | 19 | 297,533 | 15,660 | − 2.81 |
| Kauai | 1 | 21,732 | 21,732 | + 34.88 |

HOUSE

| Basic Island Unit | No. of Rep's | No. of Registered Voters | Basic Island Unit Average Reg. Voters Per Representative | Percent Deviation from State-wide Average |
|---|---|---|---|---|
| Hawaii | 6 | 46,451 | 7,742 | − 1.98 |
| Maui | 5 | 37,079 | 7,416 | − 6.10 |
| Oahu | 37 | 297,533 | 8,041 | + 1.82 |
| Kauai | 3 | 21,732 | 7,244 | − 8.28 [29] |

28. Report at 16.

29. Report at 27.

Comparisons based on island averages are naturally somewhat limited since they tend to moderate the actual deviations which exist between individual districts. This fact in mind, however, a review of these tables still shows broad discrepancies between the forms of apportionment. As to the senate, use of a civilian population would have actually resulted in a smaller maximum deviation between island averages. The registered voter based apportionment resulted in an interisland maximum deviation of 38.78%. Use of a civilian population would have shrunk this figure to 24.27%. In the house, on the other hand, the maximum interisland deviation resulting from using a civilian population base would be more than twice as large as the 11.1% deviation present in the state's registered voter based apportionment. An apportionment based just on the state's civilian population would result in a maximum deviation of 25.25%. If registered voters are used to make the initial distribution of seats among the island units, the figures in brackets, the result is still roughly the same at 26.39%. Aside from these statewide deviations, these tables also show that the average deviation for each island varies substantially depending on which population base is used.

Based on these figures, and the other evidence submitted by intervenors and plaintiffs, the state's initial showing of validity has certainly been rebutted. Moreover, a strong inference has been raised that the state's registered voter based apportionment fails to "substantially approximate" one based on a permissible base. This is not to say that there has been a dispositive showing of invalidity. The state might have rebutted this inference by estimating the actual intended population for each of the districts created. Even less comprehensive evidence of validity may have served to adequately rebut this inference. The state, however, has made no such showing. In fact, its only real response is a limited critique of the methodology of some of the studies commissioned by plaintiffs and intervenors. This is patently insufficient, however, to rebut the strong inference of invalidity raised by plaintiffs and intervenors and by the facts and figures from the Commission's report itself.

■ Under the reasoning in the *Burns* decision, use of registered voters as a surrogate base for apportionment based on a permissible population should be approved only under fairly exceptional circumstances. If a state chooses to use such a base, it has an obligation to ensure that it accurately reflects the intended, permissible population base. The *Burns* decision stated a number of ways a state could increase the accuracy of a registered voter based apportionment, including frequent reapportionments, use of presidential year figures and institution of a permanent system of registration. It is informative to note that the state has failed to adopt any of these proposals. In fact, since *Burns,* the state has actually lengthened the period of time between reapportionments from eight to ten years. In support of the state's use of registered voters at the time of *Burns,* the court noted that a high percentage of the state's eligible voters actually registered and voted. Fifteen years later, in the instant case, the evidence indicates a noticeable decrease in voter participation. Finally, and most compelling, the *Burns* Court made it clear that even if the state is able to make a *prima facie* showing that the use of registered voters is constitutional, that showing can be rebutted by contrary evidence. The state must then either come forward with more convincing evidence in its favor or face having the reapportionment plan declared unconstitutional. Here, plaintiffs and intervenors have raised, through the evidence submitted and the arguments made, a clear inference that the state's use of registered voters is constitutionally impermissible. Nothing in the Commission's report, the state's evidence or the argument of counsel overcomes this showing. The court therefore finds that the state has failed to meet its burden of showing that the use of a regis-

tered voter base substantially approximates the results of using a constitutional population base.

## REAPPORTIONMENT OF THE STATE'S CONGRESSIONAL SEATS

Finally, we consider intervenor's allegation that the reapportionment of the state's two congressional districts, contained in the 1981 Plan, violates article I, § 2 of the United States Constitution. Since 1970, the State of Hawaii has had two single-member congressional districts. State law required that the Reapportionment Commission construct congressional districts with, as near as practicable, equal numbers of registered voters. The results are as follows:

| District | Number of Representatives | Reg. Voter Per Rep. | Percent Deviation from mean of 201,398 |
|---|---|---|---|
| First | 1 | 201,567 | + 0.1 |
| Second | 1 | 201,228 | − 0.1 [30] |

Intervenors raise two separate challenges to the state's 1981 congressional redistricting. First, they maintain that "constitutional history, logic and equity" require that congressional reapportionments be based solely on total federal census figures. Alternatively, they argue that if the state is permitted to use an alternative population base, then it must demonstrate that its use of a registered voter base produces an apportionment substantially similar to one under this base. We take each argument in turn.

While similar in many ways to the case law concerning state and local apportionments, there is a separate and distinct line of authorities concerning congressional reapportionments. The Court, in *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), found that the principle of "one person, one vote" applies to congressional redistricting within each state. In so holding, however, the Court did not rely on the equal protection clause, as it had in the

prior cases involving state and local governments. Instead, it invoked article I, § 2 of the Constitution which provides, in relevant part:

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each State excluding Indians not taxed. Article I, § 2, Clause 3.

The *Wesberry* Court decided that "construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the Several States' means that as nearly as is practicable, one man's vote in a congressional election is to be worth as much as another's." *Id.* at 8–9, 84 S.Ct. at 530. In conclusion, the Court stated:

While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us. *Id.* at 18, 84 S.Ct. at 535.

Since *Wesberry,* the Court has repeatedly stated more stringent standards are to be applied to congressional reapportionments than are applied to state and local ones. For example, the Court has made it clear that even minor deviations in a congressional apportionment may subject it to challenge requiring states to show that despite a good faith effort, the resulting deviations were unavoidable. In *Kirkpatrick v. Priesler,* 394 U.S. 526, 530, 89 S.Ct. 1225, 1228, 22 L.Ed.2d 519 (1969), the Court stated that under article I, § 2 no "fixed numerical or percentage population variance [is] small enough to be considered *de minimis* and to satisfy without question the 'as nearly as practicable' standard." The Court emphasized that "since 'equal representation for equal numbers of people [is] the *fundamen-*

---

**30.** Report at 30.

*tal* goal of the House of Representatives,' *Wesberry v. Sanders, supra,* at 18 [84 S.Ct. at 535], the 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise *mathematical equality." Id.* (emphasis added). The plan struck down in Kirkpatrick had a maximum deviation of 5.97%. *Kirkpatrick's* strict rule was reaffirmed in *White v. Wessler,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), wherein the Court struck down a plan containing a maximum deviation of 4.13%. The decision in *White* contrasts sharply with *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), decided the same day, in which the Court held that a 7.83% deviation in a legislature reapportionment was *prima facie* constitutional.

Intervenors contend that the standards for congressional reapportionments differ from the standards for state and local districts in another fundamental manner. They maintain that article I, § 2 requires states to use total federal census figures to apportion congressional districts, just as the federal government is required to use these figures in apportioning congressional seats among the several states. To date, however, the Supreme Court has not faced or decided a *Burns*-like case relating to congressional districts. The issue was present in *Kirkpatrick* since the state in that case contended that population variances in its congressional districts resulted from several districts containing large numbers of military personnel and students who were not eligible to vote. While the Court questioned seriously "whether distribution of congressional seats except according to total population can ever be permissible under Article I, § 2," *Kirkpatrick,* 394 U.S. at 534, 89 S.Ct. at 1230, it chose to refrain from addressing this issue. Instead, the Court held that even if it was assumed that eligible voter based apportionments were constitutional, the state's plan would be unacceptable since the state had made "no attempt to ascertain the number of eligible voters in each district and to apportion accordingly." *Id.* at 534–35, 89 S.Ct. at 1230. Significantly, perhaps, the *Kirkpatrick* decision did not cite *Burns* or imply that any figures other than total census ones could be used in congressional apportionments.

While the Supreme Court has yet to address this issue, it has arisen in a small number of lower court cases. In *Young v. Klutznick,* the district court declared that: "It is clear that the framers of the Constitution could not have intended that the census provide the standard for apportionment among the several states while simultaneously intending that a different and possibly conflicting assessment of state population govern apportionment within the state." 497 F.Supp. 1318, 1324 (E.D.Mich. 1981), *sub nom. Young v. Baldridge, petition for cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982). The court concluded that it is "clear that the Constitution commands that the data taken from the decennial census govern the apportionment within the states." *Id.* at 1325.

On remand, the three-judge court in *Kirkpatrick* discussed, but did not decide, this same question in a well-reasoned and comprehensive appendix. *Preisler v. Secretary of State of Missouri,* 279 F.Supp. 952 (W.D.Mo.1970). The court began by stating that "the constitutional history of Art. I, § 2 would seem to make it apparent that the founders included the decennial census in that section as a central instrument designed to control and adjust the future required apportionments of the House of Representatives. It would seem historically incongruous not to require the use of the congressional decennial census in the establishment of congressional districts within the State." *Id.* at 1002. The court based this conclusion on a thorough review of the debates and other historical documents from the Constitutional Convention of 1787. For example, the Court cited Edmund Randolph's original proposal that a periodic census be held to ensure " 'fair representation of the people,' an idea endorsed by Mason as assuring that 'numbers of inhabitants' should always be the measure of representation in the House of Representatives.' " *Id.* at 998 (quoting *Wesberry v. Sanders,* 376 U.S. at 8, 84 S.Ct. at 530).

There is apparently only one reported instance of a federal district court approving the exclusion of specific groups from a state's congressional apportionment base. In *Meeks v. Avery*, 251 F.Supp. 245 (D.Kan. 1966), decided two years after Wesberry but prior to either *Burns* or *Kirkpatrick*, a three-judge court approved the state's use of a 1964 state enumeration of inhabitants and specifically rejected the argument that article I, § 2 required the state to use the 1960 federal census figures. The state census counted only those persons in each county who "had established residence in the county." *Id.* at 249. The count therefore excluded unmarried college students, military personnel living on base, persons in institutions and convicts. The *Meeks* court held that the decision to use the 1964 enumeration was merely "the exercise of judgment in the legislative process. We find no constitutional fault with the choice made." *Id.* As a final point, the court stated that the reference in article I, § 2 to the enumeration of the country's population has "to do with the apportionment of representatives among the states, not *within* them." *Id.*

■ The three-judge court in *Preisler* discussed *Meeks* and, based on its conclusions as to the historical underpinnings of article I, § 2, wrote, in part, "to indicate our disagreement with [the opinion's] rationale." *Preisler v. Secretary of State of Missouri*, 279 F.Supp. at 1003. While voicing its disagreement with the *Meeks'* court, the *Preisler* court did not reach the exact question of "whether any figures other than the federal decennial census may be used in support of a congressional plan," *id.* at 1003, since that issue was not squarely before the court. We find, however, that its reasoning on this aspect of the law is both complete and persuasive. And, while the Supreme Court has never directly addressed this particular issue, we note that starting with *Wesberry* it has repeatedly stressed that "equal representation for equal numbers of people [is] the fundamental goal of the House of Representatives." *Wesberry v. Sanders*, 376 U.S. at 18, 84 S.Ct. at 535. For these reasons, we hold

that pursuant to article I, § 2 of the Constitution states must depend on total federal census figures to apportion congressional districts within their boundaries.

■ We therefore find unpersuasive the state's argument that its high military population means that use of total population for congressional redistricting would be inappropriate and unfair to the citizens of the state. We note additionally that the presence of this large military population certainly aided the state in achieving its two congressional seats. Equity alone argues that it therefore should be included in the base used to draw the congressional districts within the state. *See Wilkins v. Davis*, 205 Va. 803, 805, 808, 139 S.E.2d 849 (1965).

Assuming *arguendo* that the holding in *Burns v. Richardson* applies to both legislative and congressional redistricting, we find that the state's congressional reapportionment plan is still fatally flawed.

As stated earlier, under *Burns* use of a registered voter base is permissible only if the resulting apportionment is shown to be substantially equivalent to one using a permissible population base. While the Commission did not attempt to calculate any alternative populations for the two congressional districts, the state produced at trial a table which gave the total populations for each district. According to the state's figures, each district varies from the ideal population by 1.5% for a total deviation of 3.0%. This fact alone, however, does not establish substantial equivalency. Had the state used total population to begin with, it would still have had to show that even with a good faith effort on its part, this relatively small deviation was unavoidable.

Absent such a showing, the plan would be invalid. Apparently, the only reason for the presence of this deviation in the apportionment of the Commission's is its use of registered voters as its population base. Use of registered voters cannot, however, in itself serve to justify a significant deviation from a proper plan based on a permissible population base. There is no evidence that

572

the state could not have used total census figures to draw districts with near mathematical precision. Accordingly, we find that the state's plan fails to approximate one based on total population.

It may be that while the congressional plan fails to reflect a total population-based apportionment, it approximates one based on state citizens or some other permissible population base. We find, however, that the burden of proving this fact rests with the state, not the challengers since the Plan's failure to replicate the results of a total population-based apportionment creates at least a *prima facie* showing of invalidity. *Calderon v. City of Los Angeles,* 4 Cal.3d 251, 93 Cal.Rptr. 361, 368, 481 P.2d 489 (1971). On the record now before the court, the state has failed to rebut this showing.

For these reasons, we find that the state's congressional apportionment, as embodied in the 1981 Plan, fails to meet the requirements of article I, § 2.

## APPENDIX A

### SENATE

| Basic Island Unit | Sen. District | No. of Sens. | No. of Registered Voters | Reg. Voters Per Sen. | Percent Deviation from Basic Island Unit Av. No. of Reg. Voters Per Sen. | Percent Deviation from State-wide Average No. of Reg. Voters Per Sen. |
|---|---|---|---|---|---|---|
| Hawaii | 1 | 3 | 46,451 | 15,484 | —0— | − 3.90 |
| Maui | 2 | 2 | 37,079 | 18,540 | —0— | + 15.07 |
| Oahu | 3 | 3 | 48,848 | 16,283 | +3.98 | + 1.06 |
|  | 4 | 4 | 65,059 | 16,265 | +3.86 | + 0.95 |
|  | 5 | 4 | 65,016 | 16,254 | +3.79 | + 0.88 |
|  | 6 | 4 | 59,101 | 14,775 | −5.65 | − 8.30 |
|  | 7 | 4 | 59,509 | 14,877 | −5.00 | − 7.67 |
| Kauai | 8 | 1 | 21,732 | 21,732 | —0— | + 34.88 |

### HOUSE

| Basic Island Unit | Rep. District | No. of Reps. | No. of Registered Voters | Reg. Voters Per Rep. | Percent Deviation from Basic Island Unit Av. No. of Reg. Voters Per Rep. | Percent Deviation from State-wide Average No. of Reg. Voters Per Rep. |
|---|---|---|---|---|---|---|
| Hawaii | 1 | 1 | 7,506 | 7,506 | − 3.05 | − 4.96 |
|  | 2 | 2 | 15,718 | 7,859 | + 1.51 | − 0.49 |
|  | 3 | 1 | 7,353 | 7,353 | − 5.02 | − 6.90 |
|  | 4 | 2 | 15,874 | 7,937 | + 2.52 | + 0.49 |
| Maui | 5 | 2 | 14,826 | 7,413 | − 0.04 | − 6.14 |
|  | 6 | 2 | 14,846 | 7,423 | + 0.09 | − 6.01 |
|  | 7 | 1 | 7,407 | 7,407 | − 0.12 | − 6.22 |
| Oahu | 8 | 2 | 16,248 | 8,124 | + 1.03 | + 2.86 |
|  | 9 | 1 | 8,177 | 8,177 | + 1.69 | + 3.53 |
|  | 10 | 2 | 16,081 | 8,041 | —0— | + 1.81 |
|  | 11 | 2 | 15,570 | 7,785 | − 3.18 | − 1.43 |
|  | 12 | 2 | 15,738 | 7,869 | − 2.14 | − 0.37 |
|  | 13 | 2 | 15,703 | 7,852 | − 2.35 | − 0.58 |
|  | 14 | 2 | 15,582 | 7,791 | − 3.11 | − 1.35 |
|  | 15 | 2 | 15,511 | 7,756 | − 3.54 | − 1.80 |

| Basic Island Unit | Sen. District | No. of Sens. | No. of Registered Voters | Reg. Voters Per Sen. | Percent Deviation from Basic Island Unit Av. No. of Reg. Voters Per Sen. | Percent Deviation from State-wide Average No. of Reg. Voters Per Sen. |
|---|---|---|---|---|---|---|
| | 16 | 2 | 15,926 | 7,963 | −0.97 | +0.82 |
| | 17 | 2 | 16,171 | 8,086 | +0.56 | +2.38 |
| | 18 | 2 | 16,059 | 8,030 | −0.14 | +1.67 |
| | 19 | 2 | 15,636 | 7,818 | −2.77 | −1.01 |
| | 20 | 2 | 16,635 | 8,318 | +3.44 | +5.32 |
| | 21 | 2 | 16,499 | 8,250 | +2.60 | +4.46 |
| | 22 | 2 | 16,482 | 8,241 | +2.49 | +4.34 |
| | 23 | 2 | 17,018 | 8,509 | +5.82 | +7.74 |
| | 24 | 1 | 8,309 | 8,309 | +3.32 | +5.19 |
| | 25 | 2 | 15,892 | 7,946 | −1.18 | +0.61 |
| | 26 | 2 | 16,005 | 8,003 | −0.47 | +1.33 |
| | 27 | 1 | 8,291 | 8,291 | +3.11 | +4.98 |
| Kauai | 28 | 3 | 21,732 | 7,244 | —0— | −8.28 |